1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   OMAR CABRERA,                          Case No.   1:20-cv-01738-KES-HBK (HC)

12              Petitioner,                  FINDINGS AND RECOMMENDATIONS TO
                                             DENY PETITION FOR WRIT OF HABEAS
13        v.                                 CORPUS AND DECLINE TO ISSUE
                                             CERTIFICATE OF APPEALABILITY [1]
14   MATTHEW McVAY,

15              Respondent.                  FOURTEEN-DAY OBJECTION PERIOD

16

17

18        I.       STATUS

19             Petitioner Omar Cabrera ("Petitioner" or "Cabrera"), a state prisoner proceeding with

20   counsel, has pending a Petition for Writ of Habeas Corpus filed under 28 U. S.C. § 2254 on

21   December 9, 2020.  (Doc. No. 1, "Petition").  Petitioner challenges his convictions following a

22   jury trial for one count of administering an intoxicant with the intent to commit a felony in

23   violation of Penal Code § 222; three counts of committing a lewd or lascivious act with a minor

24   under the age of fourteen in violation of Penal Code § 288(a); one count of attempting to commit

25   a lewd or lascivious act with a child under the age of fourteen in violation of Penal Code §§ 664

26   and 288(a); one count of attempting to commit sodomy of a minor under the age of fourteen and

27   ────────────────────────
     [1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302
28   (E.D. Cal. 2022).

                                                1

more than ten years younger than the offender in violation of previous Penal Code § 288a(c)(1);[2] one count of contact or communication with a minor with intent to commit a lewd or lascivious act in violation of Penal Code § 288.3(a); and one count of arranging to meet a minor for the purpose of engaging in lewd or lascivious behavior in violation of Penal Code § 288.4(b). (Case No. 15CMS-1347). (Doc. No. 16-7 at 2; *see* Doc. No. 28-2 at 56-65).[3]  The jury also found true a special allegation that Petitioner committed a burglary in connection with one of the counts of committing a lewd or lascivious act with a minor. (Doc. No. 16-7 at 2; Doc. No. 28-2 at 63).  The Kings County Superior Court sentenced Petitioner to an indeterminate term of twenty-five years to life plus an additional determinate term of sixteen years and eight months in prison. (Doc. No. 16-7 at 3; *see* Doc. No. 28-2 at 79-84).

On appeal, the Fifth Appellate District Court concluded the trial court erred in failing to stay Petitioner's sentences on the communication with a minor and arranging to meet a minor counts. (Case No. F075531). (Doc. No. 16-7 at 34-36).  The appellate court also found clerical errors in the abstract of judgment and sentencing minute order, which both cited to a nonexistent statute. (*Id.* at 3 n.4).  Accordingly, the appellate court ordered the trial court to correct the minutes and prepare an amended abstract of judgment. (*Id.* at 35-36).  The appellate court otherwise affirmed the modified judgment. (*Id.*).  On September 11, 2019, the California Supreme Court summarily denied review. (Case No. S256714). (Doc. No. 16-17 at 206; *see* Doc. No. 16-9).

Petitioner filed a petition for writ of habeas corpus in the trial court and on November 13, 2020, the court denied relief. (Case No. 20W0054B). (Doc. No. 16-14).  Petitioner then filed a petition in the Fifth Appellate District Court of Appeal, which also denied relief. (Case No. F082165). (Doc. No. 16-16; *see* Doc. No. 16-17 at 217).  Finally, on May 10, 2021, Petitioner filed a petition in the California Supreme Court and, and on August 18, 2021 that court denied the petition. (Case No. S268704). (Doc. Nos. 16-17, 16-18).

---

[2] Penal Code § 288a was renumbered to § 287. (*See* Doc. 16-7 at 2 n.1).

[3] All citations to the pleadings and record are to the page number as it appears on the Case Management and Electronic Case Filing ("CM/ECF") system.

The Petition initially advanced the following seven grounds for relief:

(1) Petitioner was denied his Fourteenth Amendment right to due process when the trial court denied [his] *Batson/Wheeler* motion made after the prosecutor exercised peremptory challenges against three Hispanic males in the jury pool.

(2) Petitioner was denied his Fourteenth Amendment right to due process due to the admission of a highly prejudicial photograph.

(3) Petitioner was denied his Fourteenth Amendment right to due process where there was insufficient evidence to support the finding that petitioner committed a burglary, and therefore insufficient evidence to support the "One-Strike" sentence enhancement.

(4) Petitioner was denied his Fourteenth Amendment right to due process when the trial court failed to stay the sentence in Count 1 pursuant to section 654.

(5) Petitioner was denied his Sixth Amendment right to effective assistance of counsel at trial and his Fourteenth Amendment right to effective assistance of counsel in his direct appeal when both appellate and trial counsel repeatedly failed to perform their duties at the required constitutional standard.

(6) Petitioner was denied his Eighth Amendment right against excessive fines when the trial court imposed fines without inquiring about Petitioner's ability to pay.

(7) Petitioner was denied his Sixth Amendment right to counsel and Fourteenth Amendment right to due process when the trial court refused his motion to substitute his attorney after a conflict arose during petitioner's section 1405 proceedings.

(Doc. No. 1 at 20-21). Respondent initially filed a Motion to Dismiss due to the Petition containing an unexhausted ground—ground two—and a non-cognizable ground—ground six. (Doc. No. 15). In response, Petitioner voluntarily dismissed ground two challenging the admission of a prejudicial photograph and ground six challenging a restitution fine. (Doc. No. 22). Thus, the Court need not address grounds two and six. (Doc. No. 24). Respondent then filed an Answer (Doc. No. 29) and lodged the state court record in support (Doc. Nos. 16, 16-1 through 16-18, 28, 28-1 through 28-12),[4] arguing Petitioner was not entitled to relief on the remaining grounds. Petitioner filed a reply. (Doc. No. 45). This matter is deemed submitted on the record before the Court. After careful review of the record and applicable law, the undersigned recommends the district court deny the Petition and decline to issue a certificate of appealability.

---

[4] Respondent submitted portions of the state court record in support of an earlier filed motion to dismiss and submitted the remaining state court record with the Answer.

3

1    **II.    GOVERNING LEGAL PRINCIPLES**

2        **A.    Evidentiary Hearing**

3        In deciding whether to grant an evidentiary hearing, a federal court must consider whether

4    such a hearing could enable an applicant to prove the petition's factual allegations, which, if true,

5    would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474

6    (2007). "It follows that if the record refutes the applicant's factual allegations or otherwise

7    precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.* Here,

8    the state courts adjudicated Petitioner's claims on the merits. This Court finds that the pertinent

9    facts of this case are fully developed in the record before the Court; thus, no evidentiary hearing

10   is required. *Cullen v. Pinholster*, 563 U.S. 170 (2011).

11       **B.    ADEPA General Principles**

12       A federal court's statutory authority to issue habeas corpus relief for persons in state

13   custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death

14   Penalty Act of 1996 (AEDPA). AEDPA requires a state prisoner seeking federal habeas relief to

15   first "exhaus[t] the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). If

16   the state courts do not adjudicate the prisoner's federal claim "on the merits," a *de novo* standard

17   of review applies in the federal habeas proceeding; if the state courts do adjudicate the claim on

18   the merits, then AEDPA mandates a deferential, rather than *de novo*, review. *Kernan v. Hinojosa*,

19   136 S. Ct. 1603, 1604 (2016). This deferential standard, set forth in § 2254(d), permits relief on a

20   claim adjudicated on the merits, but only if the adjudication:

21                    (1) resulted in a decision that was contrary to, or involved an
                     unreasonable application of, clearly established Federal law, as
22                   determined by the Supreme Court of the United States; or

23                    (2) resulted in a decision that was based on an unreasonable
                     determination of the facts in light of the evidence presented in the
24                   State court proceeding.

25   28 U.S.C. § 2254(d). This standard is both mandatory and intentionally difficult to satisfy.

26   *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018); *White v. Woodall*, 572 U.S. 415, 419 (2014).

27       "Clearly established federal law" consists of the governing legal principles in the

28   decisions of the United States Supreme Court when the state court issued its decision. *White*, 572

4

1  U.S. at 419.  Habeas relief is appropriate only if the state court decision was "contrary to, or an

2  unreasonable application of," that federal law.  28 U.S.C. § 2254(d)(1).  A decision is "contrary

3  to" clearly established federal law if the state court either: (1) applied a rule that contradicts the

4  governing law set forth by Supreme Court case law; or (2) reached a different result from the

5  Supreme Court when faced with materially indistinguishable facts.  *Mitchell v. Esparza*, 540 U.S.

6  12, 16 (2003).

7  　　　A state court decision involves an "unreasonable application" of the Supreme Court's

8  precedents if the state court correctly identifies the governing legal principle, but applies it to the

9  facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S.

10  133, 134 (2005), or "if the state court either unreasonably extends a legal principle from

11  [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to

12  extend that principle to a new context where it should apply."  *Williams v. Taylor*, 529 U.S. 362,

13  407, (2000).  "A state court's determination that a claim lacks merit precludes federal habeas

14  relief so long as fair-minded jurists could disagree on the correctness of the state court's

15  decision."  *Harrington v. Richter*, 562 U.S. 86, 101 (2011).  The petitioner must show that the

16  state court decision "was so lacking in justification that there was an error well understood and

17  comprehended in existing law beyond any possibility for fairminded disagreement."  *Id*. at 103.

18  　　　When reviewing a claim under § 2254(d), any "determination of a factual issue made by a

19  State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting

20  the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *Burt*

21  *v. Titlow*, 571 U.S. 12, 18 (2013) ("[A] state-court factual determination is not unreasonable

22  merely because the federal habeas court would have reached a different conclusion in the first

23  instance.") (quoting *Wood v. Allen*, 558 U.S. 290, 293 (2010)).

24  　　　Even if a petitioner meets AEDPA's "difficult" standard, he must still show that any

25  constitutional error had a "substantial and injurious effect or influence" on the verdict.  *Brecht v.*

26  *Abrahamson*, 507 U.S. 619, 637 (1993).  As the Supreme Court explained, while the passage of

27  AEDPA "announced certain new conditions to [habeas] relief," it didn't eliminate *Brecht's* actual-

28  prejudice requirement.  *Brown v. Davenport*, 596 U.S. 118, 134 (2022).  In other words, a habeas

1    petitioner must satisfy *Brecht*, even if AEDPA applies. *See id.* at 138 ("[O]ur equitable

2    precedents remain applicable 'whether or not' AEDPA applies.") (*citing Fry v. Pliler*, 551 U.S.

3    112, 121 (2007)). In short, a "federal court must deny relief to a state habeas petitioner who fails

4    to satisfy either [*Brecht*] or AEDPA. But to grant relief, a court must find that the petition has

5    cleared both tests." *Id*. at 134.

6      As discussed *supra*, for the deferential § 2254(d) standard to apply there must have been

7    an "adjudication on the merits" in state court. An adjudication on the merits does not require that

8    there be an opinion from the state court explaining the state court's reasoning. *Richter*, 562 U.S.

9    at 98. "When a federal claim has been presented to a state court and the state court has denied

10   relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

11   of any indication or state-law procedural principles to the contrary." *Id*. at 99. "The presumption

12   may be overcome when there is reason to think some other explanation for the state court's

13   decision is more likely." *Id*. at 99-100. This presumption applies whether the state court fails to

14   discuss all the claims or discusses some claims but not others. *Johnson v. Williams*, 568 U.S.

15   289, 293, 298-301 (2013).

16     While such a decision is an "adjudication on the merits," the federal habeas court must

17   still determine the state court's reasons for its decision in order to apply the deferential standard.

18   When the relevant state-court decision on the merits is not accompanied by its reasons,

19      the federal court should "look through" the unexplained decision to
20      the last related state-court decision that does provide a relevant
   rationale. It should then presume that the unexplained decision
21      adopted the same reasoning. But the State may rebut the
   presumption by showing that the unexplained affirmance relied or
22      most likely did rely on different grounds than the lower state court's
   decision, such as alternative grounds for affirmance that were
23      briefed or argued to the state supreme court or obvious in the record
   it reviewed.

24   *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The federal court "looks through" the silent state

25   court decision "for a specific and narrow purpose—to identify the grounds for the higher court's

26   decision, as AEDPA directs us to do." *Id*. at 1196.

27   **III.  RELEVANT FACTUAL BACKGROUND**

28     The Court adopts the pertinent facts of the underlying offenses, as summarized by the

California Fifth District Court of Appeal. A presumption of correctness applies to these facts.

*See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

**FACTUAL SUMMARY**

**I.    Prosecution Case**

At the time of the crimes, Doe was 12 years old and was good friends with defendant's daughter, A.C., who was then 15 years old. Doe's and A.C.'s mothers were also close friends and had known one another since high school.

**A.  First Incident After Movie**

Toward the end of February 2015, defendant, who was no longer together with A.C.'s mother, took A.C. and Doe to see a movie. Afterward, they stopped at a liquor store and defendant bought Mike's Hard Lemonade for the girls, which they began drinking in the car. The trio then went to an apartment that belonged to defendant's girlfriend, where they continued to drink. In addition to Mike's Hard Lemonade, Doe had two shots of vodka, which defendant poured, and a drink with Malibu and orange juice, which defendant mixed.

Doe became intoxicated and could barely stand up without assistance. She testified that she moved next to defendant on the couch, hugged him, ran her fingers through his hair and put her leg over him. After A.C. left to use the bathroom, defendant and Doe began kissing. Doe then pushed defendant off and told him, "[T]his is wrong, we can't do this." After A.C. returned and defendant then left to use the bathroom, Doe told A.C. she just "made out" with A.C.'s father. A.C. responded that Doe was drunk and "doing dumb stuff."

Defendant returned and then helped Doe to the bathroom. Doe testified she took defendant's hand and they went into the bedroom belonging to his girlfriend's son, where they started kissing and she tried to take his belt off. Doe testified that she felt defendant's penis inside her vagina. They then moved to defendant's girlfriend's bedroom at his suggestion and engaged in sexual intercourse a second time. After Doe looked at a clock and saw that it was getting late, she told defendant she needed to go because her mother was going to be worried.

Doe testified that after they dressed and left the room, she started to cry because she had just lost her virginity and knew it was wrong. As they walked out of the apartment, Doe told defendant she hated him. He did not respond and when A.C. asked him why Doe said that, he stated he did not know. When defendant returned to the apartment to retrieve Doe's cell phone charger and the two girls were alone in the car, Doe, who was still crying, told A.C. that she had lost her virginity to A.C.'s dad. Doe testified that she could tell from the look on A.C.'s face that A.C. did not believe her.

7

**B. Avenal Incident**

In March 2015, Doe's mother gave her permission to go to the beach for the weekend with defendant, A.C., and A.C.'s younger brother, O.C. Defendant, along with A.C. and O.C., picked Doe up at her house but, due to the time of day and defendant's need to pack, they went to the house defendant shared with his mother in a nearby town rather than leaving for the beach as planned. On the way to his house, defendant stopped at the liquor store and bought tequila and a drink called "X-Rated."

At the house, Doe and A.C. began drinking alcoholic beverages and they smoked some marijuana with defendant, which he provided. When defendant's mother and his sister arrived at the house, Doe and A.C. went to his bedroom so his mother would not see Doe. At some point, defendant's sister left and his mother went to her bedroom. Doe, A.C., O.C. and defendant were all lying on defendant's bed, where Doe testified they slept that night. Doe stated she was a bit intoxicated, but felt normal.

As defendant lay next to Doe on the bed, he began rubbing her vagina and inserting his fingers inside her. He next rubbed his penis between her buttocks before climbing on top of her and inserting his penis in her vagina. After several minutes of intercourse, defendant orally copulated Doe briefly. He asked Doe if she wanted to go into the other room and when she said no, he left.

**C. Hotel Incident**

The next morning, defendant, Doe, A.C. and O.C. traveled to Culver City and defendant rented a hotel room with two beds. That night, Doe and A.C. drank some alcohol and smoked some marijuana. Doe testified she felt a little "buzzed" and a little high. After A.C. fell asleep, defendant tugged on Doe's hand and they went into the bathroom together, where they engaged in sexual intercourse.

The next morning, while A.C. was in the shower and O.C. was on the floor watching television, defendant moved over to the bed Doe and A.C. had shared. He inserted his fingers inside Doe's vagina, but stopped when O.C. got up from the floor.

**D. Last Incident at Doe's House**

In April 2015, Doe was home alone while her mother was at a doctor's appointment. She and defendant exchanged text messages and mutually agreed defendant would come over while her mother was gone. Doe testified that after defendant arrived, they had sexual intercourse. Afterward, defendant kissed her and left.

At some point shortly thereafter, Doe's mother read a text message on Doe's phone from an unknown number and became suspicious. Doe eventually told her mother that defendant got her drunk and they had sex. Doe's parents then contacted law enforcement and defendant was arrested after Doe placed two pretextual phone calls

1    to him.

2    **II.    Defense Case**

3    Defendant's mother testified regarding the night Doe was at her
     house in Avenal. Contrary to Doe's testimony that she was in
4    defendant's bedroom when his mother came home and he did not
     want his mother to know she was there, defendant's mother stated
5    that A.C., O.C. and Doe were in the kitchen making food when she
     arrived. She said that the three children slept in the bedroom A.C.
6    and O.C. shared when they visited her, that she saw defendant go
     into his own bedroom and close the door, and that the children went
7    to bed before she did. She testified that she noticed nothing unusual
     that night.

8
     Perla Trejo, the investigator for the district attorney's office who
9    had contact with Doe, also testified for the defense. Trejo stated that
     she interviewed Doe twice but for reasons she could not explain,
10   only the first interview was recorded.

11   (Doc. No. 16-7 at 4-7 (footnotes omitted)).

12   **IV.    ANALYSIS**

13        As to the remaining five grounds (grounds one, three, four, five, and seven), Petitioner

14   raised grounds one and three on direct appeal to the Fifth Appellate District Court, which denied

15   his claims on the merits (Doc. No. 16-7), and the California Supreme Court summarily denied

16   review (*See* Doc. No. 16-17 at 206).  Thus, these claims are exhausted, and the Court looks to the

17   Fifth Appellate District's reasoned decision in evaluating Petitioner's claims under the deferential

18   standard of review.  *Wilson*, 138 S. Ct. at 1192.  However, as discussed below, while Petitioner

19   also raised a claim similar to ground four on direct appeal, Respondent asserts Petitioner failed to

20   exhaust the specific claim asserted in ground four.  Following his direct appeal, Petitioner raised

21   grounds five and seven in state habeas proceedings and was denied relief.  (Doc. Nos. 16-14, 16-

22   16, 16-18).   Respondent acknowledges that grounds five and seven are exhausted.

23   **A.    Ground One-*Batson* Challenge**

24        In his first ground, Petitioner argues the trial court improperly denied his *Batson* motion

25   made after the prosecutor exercised peremptory challenges against three Hispanic males in the

26   jury pool.  (Doc. No. 1 at 20).

27        **1.  State Court Decision**

28        In denying Petitioner's *Batson* claim on direct review, the Fifth Appellate District court

9

found as follows:

## A. Summary of Defendant's Claim

During jury selection, defendant brought a *Batson/Wheeler* motion as the prosecutor was in the process of exercising her sixth peremptory challenge to excuse potential juror D.E., a Hispanic male. During argument, defendant challenged the prosecutor's use of peremptory challenges to excuse D.E. and two other Hispanic men. On appeal, defendant limits his challenge to the excusal of D.E. Relying on his contentions that the record contradicts the prosecutor's statement that D.E. treated her questioning differently and that the record fails to support her statement that D.E. interrupted the court, defendant claims the trial court erred by failing to conduct a sincere and reasoned inquiry into the prosecutor's stated justifications.

As we shall explain, this is not a case where the record contradicts either the prosecutor's explanation for excusing D.E. or the trial court's findings, and, after the prosecutor set forth her justification for excusing D.E., defense counsel elected not to make any further argument. Under these circumstances, we agree with the People that defendant has not demonstrated *Batson/Wheeler* error. (*People* v. *Armstrong* (2019) 6 Cal.5th 735, 770 (*Armstrong*).) We nevertheless note that the trial court's findings in this case were quite summary. We encourage trial courts to bear in mind that making a clear, detailed record greatly assists our substantial evidence review on appeal, particularly in cases such as this involving demeanor-related issues that are not discernible on a cold record. (*Id.* at pp. 767-768.)

## B. Legal Standard

The standards governing *Batson/Wheeler* claims are well established. Trial courts have broad discretion over jury selection (*People* v. *Whalen* (2013) 56 Cal.4th 1,29-30, disapproved on another ground in *People* v. *Romero and Self* (2015) 62 Cal.4th 1, 44, fn. 17; *People* v. *Lenix* (2008) 44 Cal.4th 602, 608 (*Lenix*)), and peremptory challenges, which are at issue here, "are 'designed to be used "for any reason, or no reason at all (*Armstrong, supra,* 6 Cal.5th at p. 765, quoting *People* v. *Scott* (2015) 61 Cal.4th 363,387). "But there are limits: Peremptory challenges may not be used to exclude prospective jurors based on group membership such as race or gender. [Citations.] Such use of peremptory challenges violates both a defendant's right to a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution, and his right to equal protection under the Fourteenth Amendment to the United States Constitution." (*Armstrong, supra,* at pp. 765-766.)

Here, defendant bases his claim on both race and gender. Although the People cite *People* v. *Bonilla* (2007) 41 Cal.4th 313, 344, for the proposition that the California Supreme Court has questioned whether Hispanic women constitute a separate cognizable class, the

high court more recently stated it is settled law that "in addition to groups defined by either race *or* gender, groups lying at the intersection of race *and* gender are cognizable under *Wheeler*." (*Armstrong, supra,* 6 Cal.5th at p. 768.)

With respect to jury selection, "'[t]here "is a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination.'" [Citations.] Under a now familiar three-step process, a defendant [bringing a *Batson/Wheeler* motion] must first 'make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citation.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide ... whether the opponent of the strike has proved purposeful racial discrimination."' [Citations.] The defendant's ultimate burden is to demonstrate that 'it was more likely than not that the challenge was improperly motivated.'" (*Armstrong, supra,* 6 Cal.5th at p. 766; accord, *People* v. *Parker* (2017) 2 Cal.5th 1184, 1211; *People* v. *Gutierrez* (2017) 2 Cal.5th 1150, 1158-1159 (*Gutierrez*).)

## C. Procedural History

### 1. Defendant's *Batson/Wheeler* Motion

Following defendant's *Baton/Wheeler* objection, the trial court held a hearing outside the presence of potential jurors. Defendant identified the excusal of a group of three Hispanic men as the basis for his motion. Defense counsel argued, in relevant part:

> "My client is a Hispanic male and I believe it's disproportionate to the number of Hispanic males that are on the panel. Not very many, but, so far, three of them, [¶] ... [¶] ... Well, at least it's strategic, possibly. But, strategically, I think it does have a discriminatory impact. But that's what's actually, I think, occurring. [¶]... [¶] ... The people who are being excluded, I don't see anything indicating from their—other than them being just male—Hispanic males that there was any indication that they couldn't be fair to the prosecution or that they were anti-law enforcement."

### 2. Prosecutor's Justifications for Excusing D.E.

After the trial court determined that defendant had made out a prima facie case, the prosecutor advanced the following justifications for excusing D.E.:

> "As to [D.E.], he interrupted the Court a number of times. He appeared to be stubborn to me. And in terms of responding to questions he—I noted that he answered questions to the Court in a particular way and, then, he answered questions to [defense counsel] in a particular way and appeared to change his answer,

which was a concern to me. He's also unmarried, with no children."

### 3. Trial Court's Ruling

Defendant declined the opportunity to respond to the prosecutor's justifications and the trial court denied the *Batson/Wheeler* motion as follows:

> "The Court finds the challenge in this case has been proper. It establishes that peremptory challenges were exercised for reasons other than [individual] or group bias. There wasn't a match for group prejudice. This explanation provided by the People does not rise to the level of a for cause challenge. It must be based on—it has been based on juror characteristic other than race or gender and proper explanation has been satisfactory for the Court and not pretextual.

> "Jurors in this case and I believe based on what [the prosecutor] has indicated to me, without putting words in her mouth, is that she's exercised these peremptories on hunches. Some, perhaps, may have been arbitrary, however, it doesn't rise to the level of impermissible group bias. The motion is, therefore, denied."

### D. Analysis

#### 1. Standard of Review at Third Step

The trial court in this case found that defendant made a prima facie showing of group bias at the first step of the *Batson/Wheeler* analysis and, therefore, we proceed to the third step. (*People* v. *Smith* (2018) 4 Cal.5th 1134, 1147; accord, *People* v. *Melendez* (2016) 2 Cal.5th 1, 14-15.) As previously stated, "[i]n order to prevail, the movant must show it was '"more likely than not that the challenge was improperly motivated."' [Citation.] This portion of the *Batson/Wheeler* inquiry focuses on the subjective genuineness of the reason, not the objective reasonableness. [Citation.] At this third step, the credibility of the explanation becomes pertinent. To assess credibility, the court may consider, "'among other factors, the prosecutor's demeanor; ... how reasonable, or how improbable, the explanations are; and ... whether the proffered rationale has some basis in accepted trial strategy.'" [Citations.] To satisfy [himself] that an explanation is genuine, the presiding judge must make 'a sincere and reasoned attempt' to evaluate the prosecutor's justification, with consideration of the circumstances of the case known at that time, [his] knowledge of trial techniques, and [his] observations of the prosecutor's examination of panelists and exercise of for-cause and peremptory challenges. [Citation.] Justifications that are 'implausible or fantastic ... may (and probably will) be found to be pretexts for purposeful discrimination.' [Citation.] We recognize that the trial court enjoys a relative advantage vis-à-vis reviewing courts, for it draws on its contemporaneous observations when assessing a prosecutor's credibility." (*Gutierrez, supra,* 2 Cal.5th at pp. 1158-1159; accord, *Lenix, supra,* 44 Cal.4th at pp. 612-613.)

On appeal, "[w]e review a trial court's determination regarding the sufficiency of tendered justifications with "'great restraint.'" [Citation.] We presume an advocate's use of peremptory challenges occurs in a constitutional manner. [Citation.] When a reviewing court addresses the trial court's ruling on a *Batson/Wheeler* motion, it ordinarily reviews the issue for substantial evidence. [Citation.] [However, a] trial court's conclusions are entitled to deference only when the court made a 'sincere and reasoned effort to evaluate the nondiscriminatory justifications offered.' [Citation.] What courts should not do is substitute their own reasoning for the rationale given by the prosecutor, even if they can imagine a valid reason that would not be shown to be pretextual. '[A] prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives.... If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.'" (*Gutierrez, supra,* 2 Cal.5th at p. 1159; accord, *Lenix, supra,* 44 Cal.4th at pp. 613-614; *People* v. *Silva* (2001) 25 Cal.4th 345, 385-386.)

### 2. No Error

At the outset, we note that in his opening brief, defendant mischaracterized, in part, the prosecutor's justifications for excusing D.E. Defendant asserted that although the prosecutor did not ask D.E. any questions, she nevertheless stated he responded differently to her questions. He also asserted that the prosecutor "did not raise the objection of lack of children regarding [D.E.] and thus such a reason cannot be relied upon on appeal." As defendant subsequently conceded in his reply brief, the prosecutor did not state that D.E. responded differently to *her* questions and she in fact identified D.E.'s lack of children as an issue, but he argues that the latter "justification is suspicious because it was not the principal reason cited." We observe, however, that where, as here, there are multiple justifications given for the excusal of a juror, one is necessarily first, one is necessarily last and the remainder necessarily lie in between. We are unable to discern any basis in the record for casting suspicion on the prosecutor's justifications by virtue of their order.

### a. Demeanor—Related Justifications

The prosecutor identified five grounds for excusing D.E.: he interrupted the court, he appeared stubborn, he answered the court's and defense counsel's questions in a particular manner, he appeared to change his answer, and he was unmarried with no children. The first four grounds articulated find no express support in the record, but neither does the record contradict them. We would not expect stubbornness or a particular manner in which a juror answers questions to be reflected in the record. Interruptions and changes to answers might be reflected in a given record, but we cannot say this will always be so, as the prosecutor's observation or interpretation may be directly informed by body language or other unrecorded subtleties.

13

1

2       Where a prosecutor relies on demeanor and other factors not
        apparent on a cold record to excuse potential jurors, the trial court's
3       rulings "are particularly difficult to second guess. Only the trial
        court is in a position to observe these matters. The court can hear
4       the juror's tone and inflection and see whether a juror hesitates or
        struggles with particular answers in a way the record may never
5       reveal. [Citation.] Because the "'trial court is best situated to
        evaluate both the words and the demeanor of jurors who are
6       peremptorily challenged, as well as the credibility of the prosecutor
        who exercised those strikes[,] ... "these determinations of credibility
7       and demeanor lie peculiarly within a trial judge's province," and "in
        the absence of exceptional circumstances, we [will] defer to the trial
        court.'" (*Armstrong, supra,* 6 Cal.5th at p. 770.)
8

9       Notwithstanding defendant's position to the contrary, the trial
        court's failure to make a more detailed record here does not compel
10      departure from the usual deference on review. In *People v. Jones,*
        the trial court listened to the prosecutor's statement of justification,
11      offered defense counsel an opportunity to respond and, after
        defense counsel declined to comment further, denied the
12      defendant's *Batson/Wheeler* motion without further discussion.
        (*People v. Jones* (2011) 51 Cal.4th 346, 361.) The California
13      Supreme Court rejected the defendant's argument that this bare
        ruling was not entitled to deference and it concluded that the trial
14      court was not required to do more than it did. (*Ibid.*) The high court
        pointed out that "the [trial] 'court denied the motions only after
15      observing the relevant voir dire and listening to the prosecutor's
        reasons supporting each strike and to any defense argument
16      supporting the motions. Nothing in the record suggests that the trial
        court either was unaware of its duty to evaluate the credibility of
17      the prosecutor's reasons or that it failed to fulfill that duty.'" (*Ibid.*,
        quoting *People v. Lewis* (2008) 43 Cal.4th 415,471.)
18
        "'[T]he prosecutor's demeanor observations, even if not explicitly
19      confirmed by the record, are a permissible race-neutral ground for
        peremptory excusal, especially when they were not disputed in the
20      trial court. (*People* v. *Hardy* (2018) 5 Cal.Sth 56, 82, quoting
        *People* v. *Mai* (2013) 57 Cal.4th 986, 1052.) The California
21      Supreme Court has observed that defense counsel's failure to
        respond to the prosecutor's statement of reasons at the trial court's
22      invitation is "significant." (*People v. Hardy, supra,* at p. 80; accord.
        *People* v. *Mai, supra,* at p. 1052; *People* v. *Jones, supra,* 51 Cal.4th
23      at p. 361.) This is so because as the moving party, the defendant
        bears the burden of persuasion and the failure to respond to the
24      prosecutor's stated justifications deprives the prosecutor of the
        opportunity to explain further or otherwise defend those
25      justifications, deprives the trial court of the opportunity to view the
        justifications advanced through the lens of the defendant's
26      observations and arguments, and, on review, deprives the appellate
        court of a more fully developed record. (*People* v. *Hardy, supra,* at
27      pp. 80-81.) In this case, after defense counsel set forth the grounds
        for his *Batson/Wheeler* motion, the prosecutor offered her
28      justifications for excusing D.E. Defense counsel offered no further
        comment, which suggests that the prosecutor's demeanor-related

observations of D.E. were not off mark. (*People* v. *Jones, supra,* at p. 361; *People* v. *Mai, supra,* at p. 1052 & fn. 27.)

Defendant cites *Snyder* v. *Louisiana* (2008) 552 U.S. 472 and *People* v. *Silva, supra,* 25 Cal.4th 345 in support of his argument that error may be found where the record does not support the justifications advanced by the prosecutor, but both cases are distinguishable from the facts at issue here. In *Snyder* v. *Louisiana,* the prosecutor excused a student teacher based, in part, on a scheduling conflict, but on review, the United States Supreme Court found that justification was suspicious given the assurance by the potential juror's dean that serving on the jury should not present a problem and the lack of any indication in the record that the potential juror was further troubled after the dean's response. (*Snyder* v. *Louisiana, supra,* at pp. 479-483.)

In *People* v. *Silva,* the California Supreme Court found no support in the record for the prosecutor's representation that the excused juror "would be reluctant to return a death verdict [and] that he was 'an extremely aggressive person.'" (*People* v. *Silva, supra.* 25 Cal.4th at p. 385.) In contrast with those cases, the record here does not "plainly" contradict the justifications advanced by the prosecutor. (*Armstrong, supra,* 6 Cal.5th at p. 777.)

We have carefully reviewed the record and do not find exceptional circumstances justifying departure from the usual deference afforded the trial court. As previously stated, defendant does not argue that the prosecutor's justifications lacked facial neutrality, and "even a trivial reason, a hunch, or an arbitrary exclusion, if genuine and neutral, will suffice." (*People* v. *Douglas* (2018) 22 Cal.App.5th 1162, 1170, citing *People* v. *Hamilton* (2009) 45 Cal.4th 863, 901; accord, *People* v. *O 'Malley* (2016) 62 Cal.4th 944, 975; see *People v. Hensley* (2014) 59 Cal.4th 788, 803 ["Rigid jurors who appear emotionally detached and terse may be divisive during deliberations. They may not perform well as open-minded jurors willing and able to articulate their views and persuade others."]; *People* v. *Trinh* (2014) 59 Cal.4th 216, 242 [childless status one of multiple factors in excusing prospective juror].)

### b. Statistical Evidence

Nor does this case involve statistics that are troubling. (*People v. Jones, supra,* 51 Cal.4th at p. 362.) Although an express finding was not made, the trial court's comments indicate there were at least 90 jurors in the venire panel, from which 20 prospective jurors were selected for voir dire. After defendant made his *Batson/Wheeler* motion and identified Hispanic males as the group being targeted, the trial court asked counsel if he was arguing there were few Hispanic male jurors on the panel and commented, "There is a high percentage of Hispanic males on the panel." Moreover, the record indicates that D.E. was the third Hispanic male juror excused on the prosecutor's sixth peremptory challenge. We are cognizant that "'[e]xcluding by peremptory challenge even 'a single juror on the basis of race or ethnicity is an error of constitutional magnitude'" (*Gutierrez, supra,* 2 Cal.5th at p. 1172), but we

disagree with defendant that the facts in this case evidence a pattern of impermissible exclusion of Hispanic male jurors (*People* v. *Bell* (2007) 40 Cal.4th 582, 598 ["'As a practical matter ... the challenge of one or two jurors can rarely suggest a *pattern* of impermissible exclusion.'"], disapproved of on another ground by *People* v. *Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13; accord, *People* v. *Parker, supra,* 2 Cal.5th at p. 1212; *People* v. *Woodruff* (2018) 5 Cal.5th 697, 750).

### c. Comparative Juror Analysis

Comparative juror analysis evidence is also "'not necessarily dispositive, but it is [another] form of relevant circumstantial evidence.'" (*People* v. *Hardy, supra,* 5 Cal.5th at p. 77, quoting *People* v. *Melendez, supra,* 2 Cal.5th at p. 15; accord, *People* v. *Smith, supra,* 4 Cal.5th at pp. 1147-1148.) "'[E]vidence of comparative juror analysis *must* be considered in the trial court and even for the first time on appeal if relied upon by the defendant and the record is adequate to permit the urged comparisons.'" (*Gutierrez, supra,* 2 Cal.5th at p. 1174, quoting *Lenix, supra,* 44 Cal.4th at p. 622.) Here, however, defendant did not advance a comparative analysis argument in the trial court nor did he advance one in his opening brief. After the People pointed out that under these circumstances, it is unnecessary to address the issue, defendant identified, in reply, Juror No. 349035 and Juror No. 343820 for purposes of conducting a comparative analysis review.

"It is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party." (*People* v. *Tully* (2012) 54 Cal.4th 952, 1075; accord, *People* v. *Thompson* (2010) 49 Cal.4th 79, 110, fn. 13; *People* v. *Dixon* (2007) 153 Cal.App.4th 985, 996.) Given that this argument was raised for the first time in the reply brief, it is waived.

We nevertheless observe that "[comparative juror analysis has force 'when the compared jurors have expressed "a substantially similar *combination* of responses," in all material respects, to the jurors excused.'" (*Armstrong, supra,* 6 Cal.5th at p. 780, quoting *People* v. *Winbush* (2017) 2 Cal.5th 402, 443.) The only similarity arguable on this record is that the two seated jurors, one of whom was female and one of whom was male, also had no children. (See *People* v. *O 'Mailey, supra,* 62 Cal.4th at p. 976 [where comparative analysis not conducted in trial court, "'appellate court must be mindful that an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable'"].)

### d. Conclusion

We find nothing in the record contradicting the prosecutor's stated justifications, and as to the fifth justification relating to D.E.'s lack of any children, prior to excusing D.E., the prosecutor exercised peremptory challenges excusing other jurors who did not have children. That ultimately two jurors without children remained on the jury does not alter our conclusion. There is no indication in the

record that either remaining juror was materially similar to D.E., and it is well recognized that jury selection is a fluid process and the balance is complex. (*Armstrong, supra,* 6 Cal.5th at p. 780; accord, *People* v. *Winbush, supra,* 2 Cal.5th at p. 442.) "'[P]otential jurors are not products of a set of cookie cutters.' [Citation.] Two panelists might give a similar answer on a given point. Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable. These realities, and the complexity of human nature, make a formulaic comparison of isolated responses an exceptionally poor medium to overturn a trial court's factual finding." (*Lenix, supra,* 44 Cal.4th at p. 624; accord, *Armstrong, supra,* at p. 781; *People* v. *Winbush, supra,* at p. 442.)

It is incumbent on the prosecutor and the trial court to ensure a record that is sufficient to permit us to defer to the court's express or implied findings on demeanor. (*Lenix, supra,* 44 Cal.4th at pp. 623-625; *People* v. *Silva, supra,* 25 Cal.4th at p. 385; *People* v. *Long* (2010) 189 Cal.App.4th 826, 848.) This is not a case, however, where the prosecutor's proffered justifications are inherently implausible or, *critically,* contradicted by the record. (*Armstrong, supra,* 6 Cal.5th at p. 777 ["We departed from that stance of deference in *Gutierrez,* but only because the proffered reasons lacked inherent plausibility or were contradicted by the record, and the trial court did not ask the prosecutor to elaborate."]; *People* v. *Long, supra,* at p. 848 ["We are unable to extend normal deference to the trial court's implied finding on this point when another stated reason, though pronounced 'legitimate' by the trial court, was demonstrably inaccurate."].) To the contrary, as previously discussed, four of the five justifications advanced are not of the type readily apparent from a cold record and defense counsel offered no response, which suggests there was merit to the prosecutor's demeanor-related observations and they were not pretextual. Accordingly, for the reasons stated, we find defendant fails to meet his burden of demonstrating error. (*Armstrong, supra,* at p. 766.)

(Doc. 16-7 at 7-18 (footnotes omitted)).

## 2. Federal Habeas Analysis

Petitioner argues that the state appellate court unreasonably applied federal law in rejecting his *Batson* claim. (Doc. No. 1 at 32). Petitioner cites to *Miller-El v. Cockerell*, 537 U.S. 322 (2003) ("*Cockerell*"), for "the proposition that a reviewing court need not accept *any* neutral justification, if the totality of the circumstances show that the exclusion of a juror was in fact race-based." (*Id.*). Petitioner argues (1) "the state court's conclusion that the prosecutor's allegation that D.E. repeatedly interrupted the court is not 'demeanor-related' and, moreover,

1  unsupported by the record;" (2) "[t]he prosecutor's second justification, that D.E. appeared

2  'stubborn' was also not supported by the record;" (3) "the state court erred in concluding that

3  D.E. was properly excluded as a juror because he answered questions in a 'particular manner,'

4  wherein he 'appeared to change his answer' when asked questions by the court, and subsequently

5  by defense counsel;" and (4) "[w]hen considered in relation to the prosecutor's other justifications

6  for excluding D.E., the mere fact that he was childless was an insufficient justification to rebut the

7  showing that D.E. was excluded as a juror because of his gender and ethnicity." (*Id.* at 32-34).

8       Respondent argues "Petitioner failed to overcome the doubly deferential standard of

9  review that governs this fact-based claim." (Doc. No. 29 at 18). Respondent asserts that "[t]he

10  record does not contradict either the prosecutor's explanation for excusing D.E. or the trial court's

11  findings" and "Petitioner does not contend that a statistical analysis lends support to this claim,"

12  such that Petitioner "failed to overcome the doubly deferential standard requiring him to show the

13  California Court of Appeal was objectively unreasonable in finding the trial court's credibility

14  determination was supported by substantial evidence." (*Id.* at 30).

15       "The Constitution forbids striking even a single prospective juror for a discriminatory

16  purpose." *Foster v. Chatman*, 578 U.S. 488, 499 (2016) (internal quotation marks omitted). The

17  Supreme Court provided a three-step process for determining when a strike is discriminatory in

18  *Batson v. Kentucky*, 476 U.S. 79 (1986). *Id.* First, the defendant must make a prima facie

19  showing that a peremptory challenge was exercised based on the basis of race; once the showing

20  is made, the prosecution must offer a race-neutral basis for striking the juror in question; and

21  finally, based on the parties' submissions, the trial court determines whether the defendant has

22  shown purposeful discrimination. *Id.*

23       "In evaluating the race neutrality of an attorney's explanation, a court must determine

24  whether, assuming the proffered reasons for the preemptory challenges are true, the challenges

25  violate the Equal Protection Clause as a matter of law." *Hernandez v. New York*, 500 U.S. 352,

26  360 (1991). Courts must be mindful that "[p]roof of racially discriminatory intent or purpose is

27  required to show a violation" and discriminatory intent implies that the prosecution selected "a

28  particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects

18

1  upon an identifiable group." *Id.*  "[T]he ultimate burden of persuasion regarding racial

2  motivation rests with, and never shifts from, the opponent of the strike." *Rice v. Collins*, 546 U.S.

3  333, 338 (2006).

4      "[A] trial court finding regarding the credibility of an attorney's explanation of the ground

5  for a peremptory challenge is entitled to great deference." *Davis v. Ayala*, 576 U.S. 257, 271

6  (2015) (internal quotation marks omitted).  On federal habeas review, the AEDPA standard

7  applies such that a "federal habeas court must accept a state-court finding unless it was based on

8  an unreasonable determination of the facts in light of the evidence presented in the State court

9  proceedings" and "[s]tate court factual findings … are presumed correct" unless rebutted with

10  clear and convincing evidence.  *Id.* (internal quotation marks omitted).  A reviewing federal court

11  considers "whether a prosecutor's justifications are contrary to the evidence in the record, such as

12  being 'implausible or fantastic,' based on mischaracterizations of a prospective juror's testimony,

13  or belied by a comparative juror analysis."  *Oliver v. Davis*, 25 F.4th 1228, 1233 (9th Cir. 2022).

14      Here, Petitioner fails to overcome the doubly deferential standard to show he is entitled to

15  relief.  Contrary to Petitioner's argument, the state appellate court correctly cited and applied the

16  *Batson* standard.  (*See* Doc. No. 16-7 at 8-10).  Petitioner's reliance on *Cockerell* is unavailing.

17  *Cockerell* did not address whether a petitioner was entitled to federal habeas relief on his *Batson*

18  claim, but rather addressed whether a certificate of appealability ("COA") should issue following

19  the denial of habeas relief on the *Batson* claim.  *Cockerell*, 537 U.S. at 326-27.  The Supreme

20  Court explained that "[i]n the context of the threshold examination in [Miller-El's] *Batson* claim

21  the issuance of a COA can be supported by *any* evidence demonstrating that, despite the neutral

22  explanation of the prosecution, the peremptory strikes in the final analysis were race based." *Id.*

23  at 340.  The Supreme Court addressed the merits of Miller-El's claim two years later in *Miller-El*

24  *v. Dretke*, 545 U.S. 231 (2005) ("*Dretke*").

25      In *Dretke*, the Supreme Court concluded Miller-El was entitled to federal habeas relief

26  because the prosecution improperly exercised peremptory strikes to remove black jurors because

27  of race.  545 U.S. at 235-37.  The Court noted that "[o]ut of 20 black members of the 108-person

28  venire panel …, only 1 served," "9 were excused for cause or by agreement, [and] 10 were

19

1    peremptorily struck by the prosecution." *Id.* at 240-41.  "More powerful than these bare statistics

2    [were] side-by-side comparisons of some black venire panelists who were struck and white

3    panelists allowed to serve." *Id.* at 241.  For example, one panelist, Billy Jean Fields, "expressed

4    unwavering support for the death penalty" but was struck by the prosecution based on concern

5    that he would be unwilling to impose the death penalty.  *Id.* at 242-43.  However, "nonblack

6    jurors whose remarks on rehabilitation could well have signaled a limit on their willingness to

7    impose a death sentence were not questioned further and drew no objection." *Id.* at 245.  When

8    Miller-El's counsel indicated the prosecution had misrepresented Fields's testimony in offering

9    this justification for the strike, the prosecution offered Fields's brother's prior conviction as

10   another reason for the strike.  *Id.* at 245-46.  The Supreme Court concluded this explanation

11   "reek[ed] of afterthought" and was implausible based on Fields's testimony that he was not close

12   to his brother and the prosecution's failure to question him about the influence his brother's

13   history would have on him.  *Id.* at 246.  The Supreme Court also analyzed the prosecution's

14   explanation for striking Joe Warren and found its "plausibility [was] severely undercut by the

15   prosecution's failure to object to other panel members who expressed views much like Warren's"

16   regarding the death penalty.  *Id.* at 247-48.  Further, the prosecution's "late-stage decision to

17   accept a black panel member willing to impose a death sentence" when it only had four

18   peremptory strikes remaining and three members of the remaining venire panel were opposed to

19   capital punishment did not "neutralize the early-stage decision to challenge" Warren.  *Id.* at 249-

20   50.

21         As further evidence of discrimination, the Supreme Court pointed to the prosecution's

22   requests to "shuffle"[5] the panel members when the members at the front—who were more likely

23   to be seated—were black, the disproportional use of a "graphic script" to describe the death

24   penalty when questioning black panel members regarding their willingness to impose the death

25   penalty, the use of "manipulative minimum punishment questioning" wherein the prosecution

26

27   _____

     [5] Texas criminal practice allowed either side to "reshuffle the cards bearing panel members' names, thus
28   rearranging the order in which members of the venire panel are seated and reached for questioning."
     *Dretke*, 545 U.S. at 253.

1    would ask black panel members the minimum sentence they would impose without being told

2    what state law required, and the prosecution office's known policy of "systematically excluding

3    blacks from juries." *Id.* at 253-264.  Thus, when the evidence was viewed cumulatively, "its

4    direction [was] too powerful to conclude anything but discrimination." *Id.* at 265.

5          Such is not the case presented here.  While Petitioner indicates the prosecution excused

6    two Hispanic males prior to the *Batson* challenge, he does not present statistics regarding the

7    makeup of the panel as a whole similar to those presented in *Dretke*.  (*See* Doc 1 at 26, 32-34).

8    Nor does Petitioner point to other individuals of a different race or gender who were similarly

9    situated to him that were treated differently as in *Dretke*.  Petitioner baldly asserts—without

10   citation—that "the prosecutor did not employ a policy of excluding all non-parents from the jury"

11   but rather "only employed a policy of excluding Latino males." (Doc. No. 1 at 34).  However, the

12   record reveals that of the prosecution's five peremptory challenges used before Petitioner's

13   *Batson* challenge, four were used to strike jurors without children and Petitioner only identifies

14   two of these individuals as being Hispanic males.  (Doc. 28-12 at 79, 83-84, 88, 116-18).  The

15   record reveals the other two potential jurors—380131 and 354381—the prosecution excused were

16   females with non-Hispanic surnames.  (Doc. No. 28-12 at 84, 88; *see* Doc. No. 28-1 at 255).

17         As to the "demeanor-related" reasons, Petitioner asserts they are unsupported by the

18   record because there is no indication D.E. interrupted the court; "[t]he majority of D.E.'s

19   responses to the court were, 'Yes, sir,' or 'No, sir'" such that "it is inconceivable how D.E. could

20   have 'appeared stubborn;'" and D.E.'s answers to counsel "did not conflict with any of his

21   answers to the court." (Doc. No. 1 at 31-33).  The Supreme Court has recognized that

22   "peremptory challenges are often the subjects of instinct and that race-neutral reasons for

23   peremptory challenges often invoke a juror's demeanor." *Davis*, 576 U.S. at 273 (citations and

24   quotation marks omitted)).  Accordingly, "[a] trial court is best situated to evaluate both the

25   words and the demeanor of jurors who are peremptorily challenged, as well as the credibility of

26   the prosecutor who exercised those strikes." *Id.* at 273-74.  "[E]ven if reasonable minds

27   reviewing the record might disagree about the prosecutor's credibility, on habeas review that does

28   not suffice to supersede the trial court's credibility determination." *Id.* at 274 (quotations marks

1    and alterations omitted).  Here, the trial judge found the prosecution's justifications overall

2    credible.  (Doc. No. 28-12 at 158-59).  As the state appellate court correctly noted, these reasons

3    "find no express support in the record, *but neither does the record contradict them.*" (Doc. No.

4    16-7 at 12 (emphasis added)).  And neither the court nor defense counsel disputed the

5    prosecutor's characterization of D.E.'s answers and/or demeanor.

6         Ultimately, the state court's rejection of Petitioner's *Batson* claim was not contrary to, or

7    an unreasonable application of, clearly established Supreme Court precedent, nor was it based on

8    an unreasonable determination of the facts.  The undersigned recommends that ground one be

9    denied.

10        **B.    Ground Three-Insufficient Evidence**

11        In his third ground for relief, Petitioner argues he was denied his right to due process

12   because there was insufficient evidence to support the finding that he committed a burglary to

13   support the "One-Strike" sentencing enhancement.  (Doc. No. 1 at 20).

14        **1.  State Court Decision**

15        In denying Petitioner's sufficiency claim on direct review, the Fifth Appellate District

16   court found as follows:

17        **A.  Background**

18
19        In count 8, defendant was charged with committing a lewd or
        lascivious act with a minor under the age of 14 years with the
20        special circumstance allegation that the crime occurred during the
        commission of a burglary. (§§ 288, subd. (a), 667.61, subds. (c)(8),
21        (e)(2).) The jury convicted defendant of the charge, which was
        based on the last incident at Doe's house, and found the special
22        circumstance allegation true, resulting in a mandatory sentence of
        25 years to life under section 667.61, subdivision (j)(2), known as
23        the "One Strike" law. (*People* v. *Acosta* (2002) 29 Cal.4th 105,
        109.)

24        Defendant challenges the jury's special circumstance finding as
25        unsupported by substantial evidence that he committed burglary.
        Although he concedes that Doe was incapable of consenting to
26        sexual acts under the law and that his theory is "novel," he argues
        that her consent to his entry into the house for the purpose of
27        engaging in the sex act vitiates the burglary finding, precluding
        application of the One Strike law. He also argues, as we interpret it,
28        that under the circumstances of this case, he falls outside the spirit
        of the One Strike law, which "is 'to ensure serious and dangerous

sex offenders would receive lengthy prison sentences upon their first conviction,' 'where the nature or method of the sex offense "place[d] the victim in a position of elevated vulnerability. (See *People* v. *Palmore* (2000) 79 Cal.App.4th 1290, 1296.)

Relying on *People* v. *Sigur* (2015) 238 Cal.App.4th 656 *(Sigur),* the People respond that as a minor, Doe did not have authority to consent to defendant's entry for the purpose of committing a felony. They also point out that "[t]he quantum of evidence required to prove the elements of burglary is the same regardless of the penalty" and that, notwithstanding her complicity in the crime, the victim was vulnerable based on her age. We agree.

### B.  Standard of Review

"The Due Process Clause of the Fourteenth Amendment denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense" (*Carella* v. *California* (1989) 491 U.S. 263, 265, citing *In re Winship* (1970) 397 U.S. 358, 364), and the verdict must be supported by substantial evidence (*People* v. *Zamudio* (2008) 43 Cal.4th 327, 357). On appeal, the relevant inquiry governing a challenge to the sufficiency of the evidence '"'is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"' (*People* v. *Nguyen* (2015) 61 Cal.4th 1015, 1055.) "The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People* v. *Zamudio, supra,* at p. 357.)

"In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*People* v. *Zamudio, supra,* 43 Cal.4th at p. 357.) '"[I]t is the jury, not the appellate court which must be convinced of the defendant's guilt.'" (*People* v. *Nguyen, supra,* 61 Cal.4th at pp. 1055-1056.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." {*People v. Zamudio, supra,* at p. 357.) However, "speculation, supposition and suspicion are patently insufficient to support an inference of fact." (*People v. Franklin* (2016) 248 Cal.App.4th 938, 951; accord, *People* v. *Marshall* (1997) 15 Cal.4th 1, 36; *People* v. *Xiong* (2013) 215 Cal.App.4th 1259, 1268.)

### C.  Analysis

#### 1.  Commission of Burglary

"The purpose of the One Strike law is to provide life sentences for aggravated sex offenders, even if they do not have prior convictions." (*People* v. *Acosta, supra,* 29 Cal.4th at p. 127.) The

statute "'sets forth an alternative and harsher sentencing scheme for certain enumerated sex crimes' when a defendant commits one of those crimes under specified circumstances." (*Id.* at p. 118.) In this case, the jury found that defendant committed a lewd or lascivious act in violation of section 288, subdivision (a), during the commission of a burglary in violation of section 459. (§ 667.61, subd. (e)(2).)

"The crime of burglary consists of an act—unlawful entry—accompanied by the 'intent to commit grand or petit larceny or any felony.' (§ 459.) One may b[e] liable for burglary upon entry with the requisite intent to commit a felony or a theft (whether felony or misdemeanor), regardless of whether the felony or theft committed is different from that contemplated at the time of entry, or whether any felony or theft actually is committed." (*People* v. *Montoya* (1994) 7 Cal.4th 1027, 1041-1042, fn. omitted; accord, *People v. Harris* (2013) 57 Cal.4th 804, 842; *Magness* v. *Superior Court* (2012) 54 Cal.4th 270, 273.) Consent to enter is an affirmative defense and, unsurprisingly, it was not raised in the trial court in this case. (*People* v. *Sherow* (2011) 196 Cal.App.4th 1296, 1304; accord, *Sigur, supra,* 238 Cal.App.4th 656.)

In *Sigur,* cited by the People, the Court of Appeal considered whether a minor may consent to entry for the purpose of engaging in felonious sexual conduct. (*Sigur, supra.* 238 Cal.App.4th at p. 668.) As in this case, the defendant in *Sigur* was an adult in a secret sexual relationship with a minor. (*Id.* at pp. 661-662.) In relevant part, the defendant snuck into the home the minor shared with her mother and grandmother on numerous occasions to engage in sexual activity with her. (*Id.* at p. 662.) He was subsequently convicted of multiple counts of burglary, among other offenses (*id.* at p. 659) and, on appeal, he argued there was substantial evidence that the minor consented to his entry, knowing of his intent to engage in sexual activity with her (*id.* at p. 666).

On review, the Court of Appeal surveyed the law with respect to consent to entry and then considered whether a minor has the authority to consent to entry. (*Sigur, supra,* 238 Cal.App.4th at pp. 668-672.) The court concluded that "[w]hen the defendant does not have an unconditional possessory right to enter as an occupant of the premises, a defense of consent to enter the premises for the purposes of engaging in felonious sexual conduct with a minor requires one of the following: (1) the minor has a possessory interest in the premises coequal to the parent or other adult owner/occupant and expressly and clearly invited the defendant to enter so the defendant could engage in sexual conduct with the minor; (2) a parent or other adult who has a possessory interest in the premises expressly and clearly gave the defendant permission to enter for the purpose of engaging in sexual conduct with the minor; or (3) the minor expressly and clearly gave the defendant permission to enter for the purpose of engaging in sexual conduct with the minor, the minor had been given permission by the parent or other person with a possessory interest to allow entry for such purpose, and defendant knew that the minor had been given such permission." (*Id.* at pp. 672-673.)

Here, although defendant characterizes consent to enter by a minor as an unsettled area of law and he dismisses *Sigur* as "simply [serving] to characterize burglary as an offense protecting the possessory interest," he cites no authority supporting the proposition that Doe had the authority to consent to his entry for the purpose of engaging in sexual activity with her, and we find *Sigur* well reasoned and instructive. "[A] minor's authority over the family home derives from the parents' authority as the primary legal possessors." (*Sigur, supra,* 238 Cal.App.4th at p. 671, citing *People* v. *Jacobs* (1987) 43 Cal.3d 472, 483.) As in *Sigur,* "defendant invaded [Doe's] mother's possessory interest in the home and the evidence did not show that [Doe] had the authority to allow defendant into the home to engage in felonious sexual relations with her." (*Sigur, supra,* at p. 674.) Also as in *Sigur,* defendant and Doe kept their relationship secret from her mother and, as evidenced by their text messages planning to meet "to do something" during the limited time Doe's mother was out of the house, defendant was well aware that Doe lacked the authority to consent to his entry for the purpose of engaging in sexual activity with her. (*Ibid.*)

### 2. Conduct Not Outside Spirit of One Strike Law

Relatedly, defendant also argues that imposition of criminal liability under these circumstances conflicts with the legislative purpose underlying the One Strike law, although he concedes the argument is novel and the textual analysis favors the People. Defendant argues in part that the statute is ambiguous because "there is an unsettled question whether a minor can consent to entry," thereby negating the burglary. We already found this argument without merit in the preceding subsection, however. As discussed, the elements of burglary are well established (*People* v. *Montoya, supra,* 1 Cal.4th at pp. 1041-1042; *Sigur, supra,* 238 Cal.App.4th at p. 667), defendant entered Doe's residence without her mother's knowledge or permission and with the intent to engage in felonious sexual activity and, under the law, Doe could not consent to his entry for this purpose or to the underlying sexual activity.

The principles governing statutory interpretation are well established. The reviewing court's "'fundamental task ... is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.]' [Citation.] 'Because the statutory language is generally the most reliable indicator of that intent, we look first at the words themselves, giving them their usual and ordinary meaning.' [Citations.] 'If the statutory language is unambiguous, then its plain meaning controls. If, however, the language supports more than one reasonable construction, then we may look to extrinsic aids, including the ostensible objects to be achieved and the legislative history.'" (*People* v. *Ruiz* (2018) 4 Cal.5th 1100, 1105-1106.) Moreover, "'[t]he power to define crimes and prescribe punishments is a legislative function'" (*People* v. *Baker* (2018) 20 Cal.App.5th 711, 729), and "'great deference is ordinarily paid to legislation designed to protect children, who all too frequently are helpless victims of sexual offenses'" (*ibid.*).

Defendant bears the burden of demonstrating error on appeal and he cites no authority supporting his position. (*People* v. *Gamache* (2010) 48 Cal.4th 347, 378; *People* v. *White Eagle* (1996) 48 Cal.App.4th 1511, 1523; *People* v. *Clifton* (1969) 270 Cal.App.2d 860, 862.) He also identifies no ambiguity in the plain language of the statute, a point he concedes, and we do not agree that his conduct falls outside the spirit of the One Strike law. Defendant suggests that Doe's knowledge of his entry and her willingness to engage in sexual activity with him ameliorates her vulnerability as a victim. Not so.

In contrast with subdivision (b), violation of subdivision (a) of section 288 does not require the use of force, violence, duress, menace, or fear; and, notably, it is both an enumerated offense under the One Strike law (§ 667.61, subd. (c)(8)) and a violent felony under the Three Strikes law (§§ 667, subd. (d)(1), 667.5, subd. (c)(6)). Defendant's argument overlooks the critical fact that he entered a residence in which he lacked any possessory interest in order to engage in unlawful sexual intercourse with a 12-year-old child without her mother's knowledge or permission. It is the very fact that Doe was a child incapable of legally consenting to the sex act, or to the entry into her house to commit said act, that criminalizes defendant's conduct and brings the crime within the purview of the One Strike sentencing scheme. We reject defendant's contrary characterization of the matter and conclude that the jury's burglary special circumstance finding is supported by substantial evidence.

(Doc. No. 16-7 at 18-23).

### 2. Federal Habeas Analysis

Petitioner argues the state court's conclusion "that there was no ambiguity in the 'one-strike enhancement' and that petitioner's conduct did not fall outside the spirit of the law" was unreasonable. (Doc. No. 1 at 39). Petitioner's position is that the one-strike law was intended to impose more severe punishments when the circumstances surrounding the sex offense elevated the victim's vulnerability, but "there was no evidence that the purported burglary elevated any risk of harm or Doe's vulnerability" in her own home versus the other locations the sexual encounters occurred. (*Id.* at 39-40). In making his argument, Petitioner asserts "[t]he jury simply could not have found that the allegations against petitioner satisfied the legislative intent of the aggravating statute." (*Id.* at 40). Petitioner argues it was also unreasonable for the state court to reject his argument that Doe "had the authority to consent to allow [him] into the home for the purpose of engaging in sexual activity." (*Id.*).

Respondent argues Petitioner's claim is noncognizable on federal review because the state

26

1    appellate court "decided against Petitioner on both of these state-law issues, determinations which

2    are binding on this court."  (Doc. No. 29 at 38).  Because "Petitioner does not claim that the state

3    court did not receive evidence to support the elements of his conviction as those elements were

4    defined by the state court," Respondent argues "Petitioner's attempt to recast his noncognizable

5    state-law claims as a sufficiency of the evidence claim … fails."  (*Id.* at 38).

6        Petitioner replies "there was no evidence to support an essential element of the section

7    667.61(c)(8) / (d)(4) special allegation, that the burglary 'place the victim in a position of elevated

8    vulnerability'" such that his claim is based not on state law but on the denial of his constitutional

9    right to due process.  (Doc. 45-1 at 6).  Petitioner relies on *People v. Palmore*, 79 Cal. App. 4th

10   1290, 1296 (2000), and additional California case law to support his argument that elevating a

11   victim's vulnerability is an element of the sentencing enhancement.  (*Id.* at 7-11).

12       It is doubtful that Petitioner has brought a cognizable federal claim.  "The habeas statute

13   'unambiguously provides that a federal court may issue a writ of habeas corpus to a state prisoner

14   only on the ground that he is in custody in violation of the Constitution or laws or treaties of the

15   United States.'"  *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (internal citations omitted).

16   Thus, "'it is not the province of a federal habeas court to reexamine state-court determinations on

17   state-law questions.'"  *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (internal citations omitted);

18   *Swarthout*, 562 U.S. at 219 ("[F]ederal habeas corpus relief does not lie for errors of state law.").

19   Here, Petitioner's arguments focus on interpretations of state law—specifically, the circumstances

20   in which the sentencing enhancement should apply—such that he does not allege a federal claim.

21       However, even if Petitioner has asserted a federal claim, such claim fails.  Petitioner

22   invokes the Due Process Clause of the Fourteenth Amendment, which protects a criminal

23   defendant from conviction "except upon proof beyond a reasonable doubt of every fact necessary

24   to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  The

25   federal standard for determining the sufficiency of the evidence to support a jury finding is set

26   forth in *Jackson v. Virginia*, 443 U.S. 307 (1979).  Under *Jackson*, "the relevant question is

27   whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational

28   trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.*

1    at 319 (emphasis in original); *see also Coleman v. Johnson*, 566 U.S. 650, 656 (2012) ("the only

2    question under *Jackson* is whether that finding was so insupportable as to fall below the threshold

3    of bare rationality"); *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (a reviewing court "may set aside the

4    jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have

5    agreed with the jury").

6        The *Jackson* standard "must be applied with explicit reference to the substantive elements

7    of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n.16; *Juan H. v. Allen*,

8    408 F.3d 1262, 1275-76 (9th Cir. 2005).  The reviewing court should look to state law for the

9    elements of the offense and then turn to the federal question of whether any rational trier of fact

10   could have found the essential elements of the crime supported by sufficient evidence beyond a

11   reasonable doubt.  *See Johnson v. Montgomery*, 899 F.3d 1052, 1056 (9th Cir. 2018).

12       Further, when both *Jackson* and AEDPA apply to the same claim, the claim is reviewed

13   under a "twice-deferential standard." *Parker v. Matthews*, 567 U.S. 37, 43 (2012).  As noted by

14   the Supreme Court:

15           First, on direct appeal, "it is the responsibility of the jury−not the
             court−to decide what conclusions should be drawn from evidence
16           admitted at trial. A reviewing court may set aside the jury's verdict
             on the ground of insufficient evidence only if no rational trier of
17           fact could have agreed with the jury." And second, on habeas
             review, "a federal court may not overturn a state court decision
18           rejecting a sufficiency of the evidence challenge simply because the
             federal court disagrees with the state court. The federal court
19           instead may do so only if the state court decision was 'objectively
             unreasonable.' "
20

21   *Coleman*, 566 U.S. at 651.

22       The trial court sentenced Petitioner pursuant to Penal Code § 667.61(j)(2).  (Doc No. 28-

23   11).  This subsection provides that "[a] person who is convicted of an offense specified in

24   subdivision (c) under one of the circumstances specified in subdivision (e), upon a victim who is

25   a child under 14 years of age, shall be punished by imprisonment in the state prison for 25 years

26   to life."  Of relevance, subsection (c)(8) lists one of the specific offenses as lewd or lascivious

27   acts in violation of Penal Code § 288(a) and subsection (e)(2) lists one of the circumstances as

28   committing the offense during the commission of a burglary in violation of Penal Code § 459.

1    Cal. Pen. Code § 667.61(c)(8), (e)(2).  Based on the language of the statute, the elements for

2    subsection (j)(2) as applied to Petitioner are (1) conviction of committing lewd or lascivious acts;

3    (2) the acts which were the basis of the conviction were committed during the commission of a

4    burglary; and (3) the victim was under fourteen years old.

5        Petitioner does not challenge the first or third element, instead focusing only on the

6    second—whether he committed a burglary.  (Doc. No. 1 at 41).  Burglary is defined as entering

7    "any house … with intent to commit … any felony."  Cal. Pen. Code § 459.  Petitioner does not

8    dispute that he entered Doe's home with the intent to have sex with her but rather argues that

9    "Doe invited petitioner to her home in order to engage in sexual conduct," negating any liability

10   for burglary.  (Doc. No. 1 at 40-41).  However, "[m]inor children … do not have coequal

11   dominion over the family home.  Although parents may choose to grant their minor children joint

12   access and mutual use of the home, parents normally retain control of the home as well as the

13   power to rescind the authority they have given."  *People v. Jacobs*, 43 Cal. 3d 472, 482 (1987).

14   The evidence presented at trial here showed that that Doe was not allowed to have boys over

15   when she was home alone.  (Doc. No. 28-9 at 25).  Thus, Doe's invitation to Petitioner is not

16   inconsistent with the jury's conclusion that Petitioner committed a burglary and sufficient

17   evidence supports the sentencing enhancement.

18       To the extent Petitioner argues placing the victim at an elevated level of vulnerability is an

19   *element* of the enhancement, the Court is not persuaded.  Nothing in the statute itself supports this

20   additional element.  *See generally* Cal. Pen. Code § 667.61.  Petitioner's cited cases also fail to

21   support the additional element.

22       In *Palmore*, the California Fourth District Court of Appeal considered whether a

23   subsection defining one of the special circumstances as "the defendant committed [the sex

24   offense] during the commission of a burglary … of a building, including any commercial

25   establishment, which was then closed to the public" required that the commercial building be

26   closed at the time of the entry or when the sex offense was committed.  79 Cal. App. 4th at 1295-

27   96.  The court concluded that "[t]he use of the term 'during' in the clause 'the defendant

28   committed [the sex offense] *during* the commission of a burglary … of a … commercial

1    establishment, which was then closed to the public" indicates that the Legislature was using

2    'burglary' in its colloquial rather than its strict legal sense." *Id.* Thus, for purposes of the special

3    circumstance, burglary meant "the entire course of illegal entry, commission of a felony and

4    escape rather than the technical meaning of entry at a discrete time with intent to commit a

5    felony" such that the offense fell within the statute if the business was closed when the sex

6    offense was committed rather than when the initial entry occurred. *Id.* The court considered the

7    legislative history of Penal Code § 667.61, indicating the intent to ensure lengthy sentences

8    "where the nature or method of the sex offense placed the victim in a position of *elevated*

9    *vulnerability*," and found that its interpretation of the statute was consistent with this purpose. *Id.*

10   at 1296. However, the *Palmore* court did not in any way indicate that elevated vulnerability was

11   a separate *element* of the sentencing enhancement.

12          Similarly, in *People v. Luna*, the court looked first to the plain language of Penal Code §

13   667.61 in deciding whether a kidnapping (as the special circumstance) had to be committed with

14   the intent to commit rape for the enhancement to apply. 209 Cal. App. 4th 460, 466 (2012). The

15   court found the plain language of the statute was "unambiguous and certain" such that it did "not

16   require intent to commit rape or that the kidnapping be committed with the intent to commit

17   rape." *Id.* As in *Palmore*, the court looked to the legislative history only to confirm that it was

18   "in line with [the] plain reading of the statute." *Id.* at 471.

19          Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact

20   could have found beyond a reasonable doubt that Petitioner entered Doe's home with the intent to

21   have sex with when Doe did not have authority to invite him into the home. No more was

22   required for the sentencing enhancement to apply. As such, the state court's rejection of

23   Petitioner's sufficiency of the evidence claim was not contrary to, or an unreasonable application

24   of, clearly established Supreme Court precedent, nor was it based on an unreasonable

25   determination of the facts. The undersigned recommends that ground three be denied.

26          **C.      Ground Four-Failure to Stay Sentence on Count One**

27          In his fourth ground, Petitioner challenges the trial court's failure to stay his sentence on

28   count one—for administering an intoxicant with the intent to commit a felony—under California

30

1    Penal Code § 654.  (Doc. No. 1 at 42).

2    **1.  State Court Decision**

3    In denying Petitioner's § 654 claim, the Fifth Appellate District court found as follows:

4    **A.  Background**

5    Finally, in supplemental briefing, defendant claims that pursuant to
section 654, the trial court should have stayed the sentences it
6    imposed on count 1 (administering an intoxicant with the intent to
commit a felony), count 9 (contact or communication with a minor
7    with intent to commit a lewd or lascivious act), and count 10
(arranging to meet a minor for the purpose of engaging in lewd or
8    lascivious behavior) given his sentencing on the related sexual
offenses. The People concede that the court was required to stay
9    defendant's sentences on counts 9 and 10, but they dispute his
entitlement to relief on count 1. For the reasons set forth below, we
10    conclude that the trial court did not err in failing to stay defendant's
sentence on count 1 under section 654, but we accept the People's
11    concession of error on counts 9 and 10.

12    **B.  Legal Standard**

13    Section 654, subdivision (a), provides, "An act or omission that is
punishable in different ways by different provisions of law shall be
14    punished under the provision that provides for the longest potential
term of imprisonment, but in no case shall the act or omission be
15    punished under more than one provision." The statute "expressly
prohibits separate punishment for two crimes based on the same act,
16    but has been interpreted to also preclude multiple punishment for
two or more crimes occurring within the same course of conduct
17    pursuant to a single intent." (*People* v. *Vargas* (2014) 59 Cal.4th
635, 642; accord, *People* v. *Harrison* (1989) 48 Cal.3d 321, 335
18    (*Harrison*).) Determining "[w]hether a defendant may be subjected
to multiple punishment under section 654 requires a two-step
19    inquiry ...." (*People v. Corpening* (2016) 2 Cal.5th 307, 311.) "We
first consider if the different crimes were completed by a 'single
20    physical act.' [Citation.] If so, the defendant may not be punished
more than once for that act. Only if we conclude that the case
21    involves more than a single act—i.e., a course of conduct—do we
then consider whether that course of conduct reflects a single
22    '"intent and objective" or multiple intents and objectives." (*Ibid.*)

23    We review the trial court's express or implied factual findings for
substantial evidence and its conclusions of law de novo. (*People* v.
24    *Brents, supra,* 53 Cal.4th at p. 618; *People* v. *Perez* (1979) 23
Cal.3d 545, 552, fn. 5; *People* v. *Moseley* (2008) 164 Cal.App.4th
25    1598, 1603.) We "affirm the trial court's ruling, if it is supported by
substantial evidence, on any valid ground." (*People* v. *Capistrano*
26    (2014) 59 Cal,4th 830, 886, fn. 14, overruled in part on another
ground in *People v. Hardy, supra,* 5 Cal.5th at p. 104; accord,
27    *People* v. *Brents, supra,* at p. 618.)

28    ////

**C. Analysis**

**1. Count 1**

**a. Background**

The factual basis for count 1 was any one of the incidents in which defendant provided Doe with alcohol or marijuana and later engaged in a lewd or lascivious act with her. Defendant was convicted of violating section 222: administering a controlled substance, anesthetic or intoxicating agent with the intent to commit a lewd or lascivious act with a minor under the age of 14 years, in violation of section 288, subdivision (a).

During the sentencing hearing, the court selected concurrent sentences after commenting that the offenses were committed separately, at different times with different intents, and with the opportunity for reflection. (Cal. Rules of Court, rules 4.409, 4.424, 4.425.) In this appeal, defendant argues that there is no evidence he furnished alcohol or drugs to Doe for any purpose other than to facilitate the related sexual offenses and he dismisses "[t]he court's reference to opportunity for reflection [as] inapplicable for purposes of sentencing." The People contend that defendant furnished alcohol and drugs to Doe and his daughter, evidencing the additional criminal objective of enjoying alcohol and drugs with minors. Alternatively, the People contend that even if defendant acted with a single criminal objective, he engaged in a divisible course of conduct. In reply, defendant argues that his act of administering alcohol or drugs to Doe was indivisible from his commission of the lewd or lascivious act because it was incidental to, or the means of facilitating, the sex offense.

**b. No Error**

**1) Multiple Objectives**

This case does not involve a single physical act and, therefore, we focus on the second step of the analysis: whether, as defendant argues, the crimes were "'a course of conduct deemed to be indivisible in time.'" (See *People* v. *Corpening, supra,* 2 Cal.5th at p. 311.) Generally, "[w]hether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*People* v. *Capistrano, supra*, 59 Cal.4th at p. 885, quoting *People* v. *Rodriguez* (2009) 47 Cal.4th 501, 507.) However, "'[b]ecause of the many differing circumstances wherein criminal conduct involving multiple violations may be deemed to arise out of an "act or omission," there can be no universal construction which directs the proper application of section 654 in every instance.'" (*People* v. *Hicks* (2017) 17 Cal.App.5th 496, 514, quoting *People* v. *Beamon* (1973) 8 Cal.3d 625, 636; accord, *Harrison, supra,* 48 Cal.3d at p. 336.) Section 654 "is intended to ensure that [the] defendant is punished 'commensurate with his

culpability'" (*Harrison, supra,* 48 Cal.3d at p. 335), and the California Supreme Court has cautioned that "a 'broad and amorphous' view of the single 'intent' or 'objective' needed to trigger the statute would impermissibly 'reward the defendant who has the greater criminal ambition with a lesser punishment'" (*id.* at pp. 335-336, quoting *People* v. *Perez, supra,* 23 Cal.3d at p. 552).

"'If [the defendant] entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.'" (*People* v. *Porter* (1987) 194 Cal.App.3d 34, 38, quoting *People* v. *Beamon, supra,* 8 Cal.3d at p. 639; accord, *Harrison, supra,* 48 Cal.3d at p. 335; *People v. Tom* (2018) 22 Cal.App.5th 250, 260.) "Whether the defendant maintained multiple criminal objectives is determined from all the circumstances and is primarily a question of fact for the trial court, whose finding will be upheld on appeal if there is any substantial evidence to support it." (*People* v. *Porter, supra,* at p. 38, citing *People* v. *Goodall* (1982) 131 Cal.App.3d 129, 148; accord. *People* v. *Tom, supra,* at p. 260.) "'The temporal proximity of the two offenses is insufficient by itself to establish that they were incident to a single objective.'" (*People* v. *Jackson* (2016) 1 Cal.5th 269, 354, quoting *People* v. *Capistrano, supra,* 59 Cal.4th at p. 887; accord, *Harrison, supra,* at p. 335.)

Defendant was convicted of administering an intoxicant with the intent to commit a lewd or lascivious act with a minor, and the trial court impliedly determined he harbored multiple criminal objectives for the purpose of determining whether to apply section 654. (*People* v. *Islas* (2012) 210 Cal.App.4th 116, 129, citing *People* v. *Os band* (1996) 13 Cal.4th 622, 730-731.) The evidence shows that in all three incidents during which defendant furnished alcohol or marijuana to Doe and then later engaged in sexual activity with her, he also simultaneously furnished those substances to A.C., his minor daughter. The two girls, who were friends, consumed the alcohol and the marijuana together while "hanging out" with defendant, and there is no suggestion in the record that defendant engaged in any sexual conduct with his daughter. We conclude that from this evidence, the trial court could have reasonably inferred multiple criminal objectives: furnishing the minor girls with alcohol and drugs in order to party with them and also to lower Doe's inhibitions and arouse her for the purpose of later engaging in sexual activity. Accordingly, we reject defendant's contention that he was engaged in an indivisible course of conduct pursuant to a single criminal objective.

### 2)  Preparatory Misconduct

Courts have also recognized that "[i]n cases involving sex offenses, courts have found that '[e]ven where the defendant has but one objective—sexual gratification—section 654 will not apply unless the crimes were either incidental to or the means by which another crime was accomplished. [Citations.] [¶] ... S]ection 654 does not apply to sexual misconduct that is "preparatory" in the general

sense that it is designed to sexually arouse the perpetrator or the victim. (*People* v. *Hicks, supra,* 17 Cal.App.5th at p. 514, quoting *People* v. *Alvarez* (2009) 178 Cal.App.4th 999, 1006; accord, *People* v. *Madera* (1991) 231 Cal.App.3d 845, 855.)

Applying this principle, defendant's act of supplying alcohol and marijuana to Doe, while directed at a broader objective of sexual gratification, was preparatory in nature. We find *People* v. *Hicks*, not cited by the parties, analogous. The defendant in *People* v. *Hicks* was charged with human trafficking, unlawful sexual intercourse and furnishing a controlled substance to a minor. (*People* v. *Hicks, supra,* 17 Cal.App.5th at p. 515.) He advanced materially the same argument as defendant does here, which the Court of Appeal rejected, explaining, "Defendant's own argument defeats his claim with respect to the furnishing of illegal drugs. Defendant asserts the furnishing of the drugs was part of his objective which was 'sexual in nature.' We interpret that as meaning the drugs were meant to arouse the victims, and was "'preparatory'" in nature. [Citation.] Such conduct is not subject to section 654." (*Ibid.,* quoting *People* v. *Alvarez, supra,* 178 Cal.App.4th at p. 1006.)

Here, as discussed, defendant supplied Doe and his daughter with alcohol and marijuana, which they consumed together over the course of an evening. Although defendant committed the lewd or lascivious act with Doe later the same night, we decline to characterize his act of furnishing alcohol and marijuana as *merely* incidental to, or the means that *directly* facilitated, the subsequent lewd or lascivious act. (See *People* v. *Greer* (1947) 30 Cal.2d 589, 604 [removal of clothing facilitated the rape], overruled on another ground and disapproval on another ground also recognized by *People* v. *Fields* (1996) 13 Cal.4th 289, 306, fn. 4, 308, fn. 6; *People* v. *Madera, supra,* 231 Cal.App.3d at p. 855 [rubbing victim's penis prior to commission of oral copulation or sodomy not merely incidental to or facilitative of subsequent sex acts].) Rather, the alcohol and drugs were preparatory in that they resulted in the arousal of the victim and lowered her resistance to the eventual sexual contact.

(Doc. No. 16-7 at 28-34 (footnotes omitted)).

## 2. Federal Habeas Analysis

Petitioner argues that by failing to stay the sentence on count one, the trial court violated his "right to due process because it denied him his right to a state law entitlement."  (Doc. No. 1 at 44).  Petitioner argues that if he "furnished Doe and A.C. with alcohol simply for the purpose of 'partying' and having a good time, then that purpose did not satisfy section 222" because it is a specific intent crime, "requiring that the act be committed with the *specific intent* to commit some felony."  (*Id.*).

1    Respondent argues ground four fails for multiple reasons.  First, Respondent asserts

2  ground four is unexhausted because while Petitioner presented argument concerning the trial

3  court's failure to stay the sentence on direct appeal, "he did not present the federal-law

4  component of his claim to any state court."  (Doc. No. 29 at 39-40).  Next, Respondent argues

5  Petitioner's state-law claim is noncognizable and cannot be recast as a federal due process claim

6  to avoid such a finding.  (*Id.* at 44).  Third, Respondent argues that while "a state may not

7  arbitrarily deprive a defendant of a state law entitlement affecting his liberty interest, *Hicks v.*

8  *Oklahoma*, 447 U.S. 343, 346 (1980), neither the United States Supreme Court nor the Ninth

9  Circuit has recognized California Penal Code § 654 as creating a liberty interest that is protected

10  by the Fourteenth Amendment."  (*Id.*).  Finally, Respondent argues "the California Court of

11  Appeal's finding that the trial court did not err under state law satisfied any liberty interest that

12  Petitioner may have had under California Penal Code § 654."  (*Id.*).

13    Petitioner's challenge to the state court's interpretation and application of § 654 is not

14  cognizable on federal habeas review.  As discussed above, "'it is not the province of a federal

15  habeas court to reexamine state-court determinations on state-law questions.'"  *Wilson*, 562 U.S.

16  at 5 (internal citations omitted); *see Watts v. Bonneville*, 879 F.2d 685, 687 (9th Cir. 1989)

17  (petitioner's claim that the California courts violated § 654 was not cognizable on federal habeas

18  review).

19    To the extent Petitioner's § 654 challenge asserts a federal claim, such is unexhausted.

20  "[E]xhaustion of state remedies requires that petitioners fairly present federal claims to the state

21  courts in order to give the State the opportunity to pass upon and correct alleged violations of its

22  prisoners' federal rights."  *Marks v. Davis*, 106 F.4th 941, 995-96 (9th Cir. 2024) (quotation

23  marks and alterations omitted).  "To fairly present a claim, a petitioner must present the substance

24  of his claim to the state courts, *including a reference to a federal constitutional guarantee* and a

25  statement of facts that entitle the petitioner to relief."  *Id.* at 996 (emphasis added).  Here,

26  Petitioner first raised his § 654 claim in a supplemental brief on direct appeal but, in doing so,

27  relied entirely on state law without any mention of a constitutional violation.  (*See generally* Doc.

28  No. 16-5).  After the Court of Appeal rejected his claim, Petitioner raised it to the California

Supreme Court but again relied on state law without alleging a constitutional violation.  (Doc. No. 16-8 at 38-42).  As such, Petitioner has never presented his constitutional claim based on § 654 to the state courts and his federal claim is unexhausted.

Even if Petitioner's federal claim were exhausted, he is not entitled to relief.  "A State violates a criminal defendant's due process right to fundamental fairness if it arbitrarily deprives the defendant of a state law entitlement."  *Laboa v. Caleron*, 224 F.3d 972, 979 (9th Cir. 2000) (citing *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980)).  However, Petitioner fails to offer any support that § 654 created an entitlement.  Further, even if the Court assumes such an entitlement, no arbitrary deprivation occurred.  The state appellate court examined the record and concluded Petitioner's conduct in providing alcohol and drugs to Doe was preparatory because "they resulted in the arousal of the victim and lowered her resistance to the sexual contact."  (Doc. 16-7 at 33-34).  Because § 654 "does not apply to sexual misconduct that is 'preparatory,'" the state appellate court concluded Petitioner's separate sentences were proper.  (*Id.*).  Accordingly, Petitioner has not shown a due process violation.

For the foregoing reasons, the undersigned recommends that ground four be denied.

## D. Ground Five-Ineffective Assistance of Counsel

In ground five, Petitioner alleges he received ineffective assistance of counsel both at trial and in his direct appeal.  (Doc. No. 1 at 20).  Petitioner challenges trial counsel's failure to (1) move to suppress certain evidence; (2) make a record of trial errors; and (3) object to inadmissible evidence.  (*Id.* at 46).  He also challenges appellate counsel's failure to raise a viable claim of error.  (*Id.*).  However, Petitioner concedes that he had not exhausted these claims as of the filing of the Petition and indicated he would amend them in a later petition.  (*Id.*).  However, Petitioner did not amend the Petition after exhausting his ineffective assistance claims in state court.

Respondent argues Petitioner "failed to allege with the requisite specificity the bases for his ineffective assistance claim in his counseled § 2254 federal petition" such that the petition "does not state a basis for relief."  (Doc. No. 29 at 46).  Respondent argues that while Petitioner's state habeas petitions allege in "far greater detail the basis for his ineffectiveness-of-counsel

1  claims," Petitioner "did not amend his § 2254 petition to include these numerous, detailed factual
2  allegations, resting instead on his conclusory ones."  (*Id.* at 45).

3      Rule 2(c) of the Rules Governing Section 2254 Cases states that a federal habeas petition
4  must specify all grounds for relief and "state all the facts supporting each ground."  Rule 2(c)
5  requires specific pleading of facts that, if proven to be true, would entitle the petitioner to federal
6  habeas relief.  Claims based on conclusory allegations are not a sufficient basis for federal habeas
7  relief.  *See Mayle v. Felix*, 545 U.S. 644, 655-56 (2005) (acknowledging that notice pleading is
8  insufficient to satisfy the specific pleading requirement for federal habeas petitions); *James v.*
9  *Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("[C]onclusory allegations which are not supported by a
10  statement of specific facts do not warrant habeas relief."); *see also Blackledge v. Allison*, 431
11  U.S. 63, 74 (1977).

12      Here, the Petition lacks specific pleading of facts that, if proven to be true, would entitle
13  Petitioner to federal habeas relief.  While, as Respondent argues, Petitioner's state court filing
14  provides the basis of his ineffective assistance claim, Petitioner—who, importantly, is represented
15  by counsel—never requested to amend his Petition or make any other effort to identify the factual
16  support for his claims before this Court.  Indeed, other than identifying caselaw, the two pages
17  devoted to this ground lists only the unexhausted claims but contains no argument.  (Doc. No. 1 at
18  45-46).  Accordingly, the undersigned recommends that ground five be denied for failure to state
19  a claim.

20  **E.  Ground Seven-Denial of Motion to Substitute Counsel**

21      Under a heading alleging he was denied his right to counsel, Petitioner argues the trial
22  court erred in refusing to allow him to substitute counsel regarding his motion for DNA testing
23  because "appointed counsel, against the wishes of petitioner, filed a motion stating that the court
24  should not allow for DNA testing pursuant to Penal Code section 1405, petitioner moved for new
25  appointed counsel[, and c]ounsel's motion to effectively withdraw the 1405 motion created a
26  conflict of interest between petitioner and counsel."  (Doc. No. 1 at 48).

27      Respondent argues this claim is noncognizable because "there is no constitutional right to
28  counsel in state post-conviction proceedings."  (Doc. No. 29 at 47-48).  Additionally, Respondent

1    argues "Petitioner failed to demonstrate that the state courts' denial of his Sixth Amendment

2    claim was contrary to, or an unreasonable interpretation of, clearly established Supreme Court

3    precedent" such that he is not entitled to relief.  (*Id.* at 48).

4         It is unclear from the petition whether Petitioner is challenging the trial court's denial of

5    new counsel or his counsel's performance.  Regardless of the basis of Petitioner's claim, he has

6    not shown that he is entitled to relief.  While a defendant has a right to counsel on direct appeal

7    after a criminal conviction, he does not have a right to counsel when seeking "post-conviction"

8    relief, such as in a state habeas petition.  *Coleman v. Thompson*, 501 U.S. 722, 752-57 (1991); *see*

9    *also Pennsylvania v. Finley*, 481 U.S. 551, 555, 557 (1987) ("Postconviction relief … is a

10   collateral attack that normally occurs only after the defendant has failed to secure relief through

11   direct review of his conviction"; prisoner has no constitutional right to counsel "when attacking a

12   conviction that has long since become final upon exhaustion of the appellate process").  Because

13   a defendant has no constitutional right to counsel, he could not be deprived of the effective

14   assistance of counsel.  *Wainwright v. Torna*, 455 U.S. 586, 588 (1982).  Thus, because Petitioner

15   had no constitutional right to *any* counsel on post-conviction relief, neither the trial court's denial

16   of *different* counsel nor appointed counsel's allegedly deficient performance warrant federal

17   habeas relief.  Accordingly, the undersigned recommends that ground seven be denied.

18        **V.  CERTIFICATE OF APPEALABIILTY**

19        A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district

20   court's denial of a petition; he may appeal only in limited circumstances.  *See* 28 U.S.C. § 2253;

21   *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  Rule 11 Governing § 2254 Cases requires a

22   district court to issue or deny a certificate of appealability when entering a final order adverse to a

23   petitioner.  *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th

24   Cir. 1997).  A certificate of appealability will not issue unless a petitioner makes "a substantial

25   showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This standard requires

26   the petitioner to show that "jurists of reason could disagree with the district court's resolution of

27   his constitutional claims or that jurists could conclude the issues presented are adequate to

28   deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at 327; *accord Slack v.*

1  *McDaniel*, 529 U.S. 473, 484 (2000).  Because Petitioner has not made a substantial showing of

2  the denial of a constitutional right, the undersigned recommends that the court decline to issue a

3  certificate of appealability.

4      Accordingly, it is **RECOMMENDED**:

5      1.  Petitioner be DENIED all relief on his Petition for Writ of Habeas Corpus (Doc. No.

6          1); and

7      2.  Petitioner be denied a certificate of appealability.

8                              **NOTICE TO PARTIES**

9      These Findings and Recommendations will be submitted to the United States District

10  Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days

11  after being served with a copy of these Findings and Recommendations, a party may file written

12  objections with the Court.  *Id*.; Local Rule 304(b).  The document should be captioned,

13  "Objections to Magistrate Judge's Findings and Recommendations" and shall not exceed **fifteen**

14  **(15) pages**.  The Court will not consider exhibits attached to the Objections.  To the extent a party

15  wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its

16  CM/ECF document and page number, when possible, or otherwise reference the exhibit with

17  specificity.  Any pages filed in excess of the fifteen (15) page limitation may be disregarded by

18  the District Judge when reviewing these Findings and Recommendations under 28 U.S.C. §

19  636(b)(l)(C).  A party's failure to file any objections within the specified time may result in the

20  waiver of certain rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).

21

22  Dated:    March 18, 2025

23                                  HELENA M. BARCH-KUCHTA

24                                  UNITED STATES MAGISTRATE JUDGE

25

26

27

28